AMERICAN STATES INSURANCE COMPANY, on its Own Behalf and on Behalf of the Combined Group American States Insurance Company and Combined Subsidiaries American Economy Insurance Company, *et al.*, Plaintiffs-Appellees, v. BRIAN A. HAMER, as Director of the Department of Revenue, *et al.*, Defendants-Appellants.

First District (5th Division)   No. 1—03—1646

Opinion filed August 27, 2004.

522

Lisa Madigan, Attorney General, of Chicago (Gary Feinerman, Solicitor General, and Brian F. Barov, Assistant Attorney General, of counsel), for appellants.

Novak & Macey, L.L.P., of Chicago (Karen L. Levine, of counsel), and McKee Nelson L.L.P., of Washington, D.C. (John A. Galotto and Richard C. Stark, of counsel), for appellee.

PRESIDING JUSTICE CAMPBELL delivered the opinion of the court:

Defendants Brian A. Hamer, as Director of the Illinois Department of Revenue,[1] the Illinois Department of Revenue (Department), and Judy Baar Topinka, as Treasurer of the State of Illinois, appeal from an order of the circuit court of Cook County granting summary judgment to the plaintiff taxpayer, American States Insurance Company (American States). American States brought this suit pursuant to sections 1, 2, 2a and 2a.1 of the State Officers and Employees Money Disposition Act (Protest Monies Act) (30 ILCS 230/1 *et seq.* (West 2000)), to protest a notice of income tax deficiency issued by the Department. The issue is whether a gain from the sale of American States should be classified as business or nonbusiness income.

The record on appeal discloses that American States, a foreign corporation and Illinois taxpayer, is the designated agent of a group of combined insurance companies and its subsidiaries. In 1997, American States was owned by American States Financial Corp. (ASFC). More than 80% of ASFC's stock was owned by Lincoln National Corporation (Lincoln), an Indiana corporation.

In October 1997, SAFECO Corporation purchased 100% of ASFC's stock from Lincoln and the minority shareholders, resulting in a cash distribution to all shareholders. SAFECO formed a subsidiary named ASFC Acquisition Corporation, which merged with ASFC. American States continued to do business in Illinois after the sale.

SAFECO and Lincoln elected to treat the stock sale as a "deemed sale of assets" under section 338 of the Internal Revenue Code (26 U.S.C. § 338 (1994)). Section 338 provides in part as follows:

"(a) General Rule

For purposes of this subtitle, if a purchasing corporation makes an election under this section \*\*\*, then, in the case of any qualified stock purchase, the target corporation—

(1) shall be treated as having sold all of its assets at the close of the acquisition date at fair market value in a single transaction [to which section 337 applies], and

(2) shall be treated as a new corporation which purchased all of the assets referred to in paragraph (1) as of the beginning of the day after the acquisition date.

\* \* \*

(h) Definitions and special rules. For purposes of this section

---

[1]This suit was originally filed against Hamer's predecessor, Glenn L. Bower, as Director of the Illinois Department of Revenue. Hamer has been substituted as a party as a matter of law. 735 ILCS 5/2—1008(d) (West 2002).

\* \* \*

(10) Elective recognition of gain or loss by target corporation, together with nonrecognition of gain or loss on stock sold by selling consolidated group.

(A) In general

Under regulations prescribed by the Secretary, an election may be made under which if—

(i) the target corporation was, before the transaction, a member of the selling consolidated group, and

(ii) the target corporation recognizes gain or loss with respect to the transaction as if it sold all of its assets in a single transaction,

then the target corporation shall be treated as a member of the selling consolidated group with respect to such sale, and (to the extent provided in regulations) no gain or loss will be recognized on stock sold or exchanged in the transaction by members of the selling consolidated group.

(B) Selling consolidated group

For purposes of subparagraph (A), the term 'selling consolidated group' means any group of corporations which (for the taxable period which includes the transaction)—

(i) includes the target corporation, and

(ii) files a consolidated return." 26 U.S.C. § 338 (1994). It is undisputed that the purchase of ASFC's stock was a "qualified stock purchase" within the meaning of section 338.

Lincoln reported a $1,274,287,783 gain from the sale of American States on its federal consolidated return. American States reported the gain on its Illinois combined income tax return as nonbusiness income. The Department audited the American States returns for tax years 1995, 1996 and 1997. The Department concluded that the gain from the sale of American States was business income. On June 21, 2001, the Department issued a notice of tax deficiency for 1997 with a statutory deficiency of $7,456,635 and interest to date of $2,009,001.

On August 17, 2001, American States paid the disputed amount into the protest fund. On August 29, 2001, American States filed a three-count complaint under the Protest Monies Act. Count II of the complaint alleged that the Department erred in classifying the gain from the sale of American States as business income. On September 5, 2001, the trial court entered an order preliminarily enjoining any transfer of the disputed funds out of the protest fund.

On June 7, 2002, American States moved for summary judgment on count II of its complaint. On July 31, 2002, defendants filed their cross-motion for summary judgment. On October 29, 2002, following the submission of memoranda and argument on the matter, the trial

court entered an order granting summary judgment in favor of the defendants. On November 20, 2002, American States moved for reconsideration. On April 25, 2003, the trial court granted the motion for reconsideration and entered an order granting summary judgment to American States. On May 6, 2003, the trial court granted the defendants' motion for a finding that there was no just reason to delay enforcement or appeal, pursuant to Supreme Court Rule 304(a) (134 Ill. 2d R. 304(a)). Defendants then filed a notice of appeal to this court.

# I

The issue on appeal is whether the trial court erred in granting summary judgment. When reviewing a trial court's order of summary judgment, the only issue on appeal is whether the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. *Board of Directors of Olde Salem Homeowners' Ass'n v. Secretary of Veterans Affairs*, 226 Ill. App. 3d 281, 284-85, 589 N.E.2d 761, 763 (1992). Although the use of a summary judgment procedure is encouraged as an aid in expeditious disposition of a lawsuit, it is a drastic means of disposing of litigation and should only be allowed when the right of the moving party is clear and free from doubt. *Purtill v. Hess*, 111 Ill. 2d 229, 240, 489 N.E.2d 867, 871 (1986). In determining whether the moving party is entitled to summary judgment, the court must construe the pleadings, depositions, admissions and affidavits strictly against the movant and liberally in favor of the opponent. *In re Estate of Whittington*, 107 Ill. 2d 169, 177, 483 N.E.2d 210, 215 (1985). Although the court may draw inferences from the undisputed facts, where reasonable persons could draw divergent inferences from the undisputed facts, the issue should be decided by the trier of fact and the motion should be denied. See *Pyne v. Witmer*, 129 Ill. 2d 351, 358, 543 N.E.2d 1304, 1308 (1989). Our standard of review of the circuit court's decision to grant summary judgment is *de novo*. *Mack v. Ford Motor Co.*, 283 Ill. App. 3d 52, 669 N.E.2d 608 (1996).

# II

■ The issue is whether the Department properly characterized the gain from the sale of American States as "business income." The Illinois Income Tax Act (Act) (35 ILCS 5/101 *et seq.* (West 2000)), derived from the Uniform Division of Income for Tax Purposes Act (UDITPA), addresses when income of a nonresident corporation conducting business within Illinois is subject to taxation by the State. Under the statute, foreign corporations are required to pay taxes in

proportion to the amount of their income-producing activities. 35 ILCS 5/304(a) (West 2000); *Texaco-Cities Service Pipeline Co. v. Mc-Gaw*, 182 Ill. 2d 262, 268, 695 N.E.2d 481, 484 (1998); *Automatic Data Processing, Inc. v. Illinois Department of Revenue*, 313 Ill. App. 3d 433, 438, 729 N.E.2d 897, 902 (2000).

The Act generally establishes two methods by which corporate income will be divided among Illinois and the other jurisdictions in which the taxpayer conducts business: "apportionment" and "allocation." The method by which the taxpayer's income will be divided turns upon whether the income is classified as "business income" or "nonbusiness income."

■ Section 1501 of the Act defines "business income" as:

"income arising from transactions and activity in the regular course of the taxpayer's trade or business, *** and includes income from tangible and intangible property if the acquisition, management, and disposition of the property constitute integral parts of the taxpayer's regular trade or business operations." 35 ILCS 5/1501(a)(1) (West 2000).

This definition is virtually identical to the definition contained in section 1(e) of the UDITPA. *Texaco-Cities*, 182 Ill. 2d at 268, 695 N.E.2d at 484. Income falling within the purview of the foregoing definition is subject to apportionment in Illinois through use of a three-factor formula that takes into account the corporation's property, payroll and sales. 35 ILCS 5/304(a)(1), (a)(2), (a)(3) (West 2000).

■ Any income not deemed to be business income is considered nonbusiness income. 35 ILCS 5/1501(a)(13) (West 2000). For taxing purposes, nonbusiness income is allocated to a particular state, generally the state in which the corporation is domiciled or in which the income-producing property is situated. 35 ILCS 5/303 (West 2000); *Automatic Data Processing*, 313 Ill. App. 3d at 438, 729 N.E.2d at 902.

■ Following the approach of other jurisdictions that have adopted the UDITPA, our supreme court has recognized that section 1501(a)(1) of the Act encompasses two alternative and distinct approaches for determining whether gain realized from the sale of a capital asset may be apportioned. The first, or "transactional" test, is reflected by the first clause of the definition stating that business income is " 'income arising from transactions and activity in the regular course of the taxpayer's trade or business.' " *Texaco-Cities*, 182 Ill. 2d at 267, 695 N.E.2d at 484, quoting 35 ILCS 5/1501(a)(1) (West 1994). The transactional test classifies income as business income if the gain is " 'attributable to a type of business transaction in which [the] taxpayer regularly engages.' " *Texaco-Cities*, 182 Ill. 2d at 269, 695 N.E.2d at 484, quoting *National Realty & Investment Co. v. Department of*

*Revenue*, 144 Ill. App. 3d 541, 554 (1986). Under this approach, the use or function of the asset sold is not determinative. *General Care Corp. v. Olsen*, 705 S.W.2d 642, 645 (Tenn. 1986); *Western Natural Gas Co. v. McDonald*, 202 Kan. 98, 101, 446 P.2d 781, 783 (1968). Rather, it is the nature, frequency and regularity of the income-generating transaction that define the transactional test. *Texaco-Cities*, 182 Ill. 2d at 269, 695 N.E.2d at 484; see also *Ross-Araco Corp. v. Commonwealth of Pennsylvania Board of Finance & Revenue*, 544 Pa. 74, 79, 674 A.2d 691, 693 (1996).

The Department does not claim that the gain at issue is business income under the transactional test. Rather, the Department bases its determination on the second, or "functional," test, which is embodied in the second clause that defines business income as including " 'income from tangible and intangible property if the acquisition, management, and disposition of the property constitute integral parts of the taxpayer's regular trade or business operations.' " *Texaco-Cities*, 182 Ill. 2d at 267, 695 N.E.2d at 484, quoting 35 ILCS 5/1501(a)(1) (West 1994). As construed by our supreme court, "the words 'acquisition, management, and disposition' suggest elements typically associated with the 'keeping' of corporate property, or *** the 'conditions of ownership' of corporate property." *Texaco-Cities*, 182 Ill. 2d at 271, 695 N.E.2d at 485. According to the *Texaco-Cities* court:

> "The functional test classifies as business income all gain from the disposition of a capital asset if the asset was 'used by the taxpayer in its regular trade or business operations.' *** [T]he second clause of section 1501(a)(1) focuses upon the role or function of the property [disposed of] as being integral to regular business operations. The use of a capital asset in the taxpayer's regular trade or business indisputably renders that asset an integral part of the taxpayer's regular business operations." *Texaco-Cities*, 182 Ill. 2d at 272, 695 N.E.2d at 486.

The court further added that "the extraordinary nature or infrequency of the sale is irrelevant" in applying the functional approach. *Texaco-Cities*, 182 Ill. 2d at 269, 695 N.E.2d at 485.

■ In *Texaco-Cities*, the taxpayer was in the business of transporting crude oil and other petroleum products by pipeline. As part of its business, Texaco-Cities owned and operated pipelines that ran through several states, including Illinois. During the 1983 tax year, Texaco-Cities sold major segments of its pipeline assets, including its entire contingent of assets in Illinois. As a result, Texaco-Cities realized a nearly 90% reduction in its total pipeline miles and generated a gain of $9,987,176. Texaco-Cities reported the income from its sale as nonbusiness income on its return for the 1983 tax year. The Depart-

ment reclassified the gain as "business income" subject to apportionment under the Act, finding the sale to have constituted an integral part of Texaco-Cities' business operations. Texaco-Cities' protest to the reclassification proved unsuccessful and the company filed for administrative review.

In a 4 to 3 decision, the supreme court, applying a functional test, held the gain realized by Texaco-Cities represented apportionable business income under the Act. After characterizing the pipeline assets as income-producing property while held by the taxpayer, the *Texaco-Cities* court examined and distinguished the Pennsylvania Supreme Court decision in *Laurel Pipe Line Co. v. Commonwealth of Pennsylvania Board of Finance & Revenue*, 537 Pa. 205, 642 A.2d 472 (1994), which similarly considered the issue of whether the proceeds from the sale of a pipeline held by a company engaged in the petroleum product transportation business constituted business or nonbusiness income under statutory apportionment provisions nearly identical to those contained in the Act, but concluded that the gain was nonbusiness income. In distinguishing *Laurel Pipe Line*, the *Texaco-Cities* court explained that the sale consummated by Texaco-Cities, unlike the transaction involved in *Laurel Pipe Line*, did not represent a liquidation and cessation of Texaco-Cities business operations or a distinct and separate portion thereof. *Texaco-Cities*, 182 Ill. 2d at 273-74, 695 N.E.2d at 487. The *Texaco-Cities* court noted that after the sale, Texaco-Cities "remained primarily in the business of providing transportation by pipeline, and that the sales proceeds were invested right back into that business rather than being disseminated to its shareholders." *Texaco-Cities*, 182 Ill. 2d at 273, 695 N.E.2d at 486-87.

The analysis of *Laurel Pipe Line* in *Texaco-Cities* raises the question of whether our supreme court would conclude that a gain from the liquidation and cessation of business operations—or a distinct and separate portion thereof—is nonbusiness income. American States notes that in *Blessing/White, Inc. v. Zehnder*, 329 Ill. App. 3d 714, 726, 768 N.E.2d 332, 341-42 (2002), concluded that *Texaco-Cities* "tacitly recognizes the distinctive nature of corporate liquidations resulting in a discontinuation of business activity and suggests that the functional test will be met in such cases only where the property and the liquidation of assets (*i.e.*, disposition) are essential to the taxpayer's regular trade or operations." (Emphasis omitted.) American States argues that the gain at issue here constitutes nonbusiness income under *Blessing/White*.

The Department argues that *Blessing/White* was wrongly decided and should not be followed. Citing case law from other jurisdictions, opinions of taxing authorities in other jurisdictions, treatises and

articles, the Department argues that cases recognizing a "cessation of business" exception by examining the "totality of the circumstances," as in *Laurel Pipe Line*, improperly confuses the functional test with elements of the transactional test. See, *e.g.*, A. Chang, *The Conflict Between the Cessation-of-Business Concept and the Functional Test in California and in Other UDITPA States*, 2 Multistate Tax Comm'n Rev. 8 (2001).

*Blessing/White* was decided by the third division of the First District; principles of *stare decisis* do not require us to follow precedent established by another division of the First District. See *Schiffner v. Motorola, Inc.*, 297 Ill. App. 3d 1099, 1102, 697 N.E.2d 868, 871 (1998). Indeed, as in *Schiffner*, the point of law at issue here can hardly be considered settled, as *Blessing/White* is the only Illinois case to date considering the implication of the analysis of *Laurel Pipe Line* in *Texaco-Cities*. Moreover, neither *Texaco-Cities* nor *Blessing/White* addressed a deemed liquidation occurring under section 338(h)(10) of the internal Revenue Code.[2] Nevertheless, a disagreement among the divisions can cause confusion for the circuit courts and the parties appearing before them. See *Schiffner*, 297 Ill. App. 3d at 1103 n.1, 697 N.E.2d at 871 n.1. This court considers the Department's secondary authorities with these factors in mind.

The Department notes that California treats gains from the cessation of business as business income. See, *e.g.*, *Hoechst Celanese Corp. v. Franchise Tax Board*, 25 Cal. 4th 508, 527, 22 P.3d 324, 337, 106 Cal. Rptr. 2d 548, 564 (2001). However, courts in a number of other jurisdictions adopting UDITPA have classified gains from the cessation of business as nonbusiness income. *E.g.*, *Ex parte Uniroyal Tire Co.*, 779 So. 2d 227, 236 (Ala. 2000); *Kemppel v. Zaino*, 91 Ohio St. 3d 420, 422, 746 N.E.2d 1073, 1076 (2001); *Federated Stores Realty, Inc. v. Huddleston*, 852 S.W.2d 206, 211 (Tenn. 1992); *Western Natural Gas Co. v. McDonald*, 202 Kan. 98, 101, 446 P.2d 781, 784 (1968); *McVean & Barlow, Inc. v. New Mexico Bureau of Revenue*, 88 N.M. 521, 543 P.2d 489 (App. 1975); *May Department Stores Co. v. Indiana Department of State Revenue*, 749 N.E.2d 651, 663-65 (Ind. Tax Ct. 2001). See also *Canteen Corp. v. Commonwealth*, 818 A.2d 594 (Pa. Cmmw. Ct. 2003), *aff'd per curiam without op.* No. 57 MAP 2003 (July 20, 2004) (holding gain from cessation of business to be nonbusiness income in the context of a section 338 election). The Department notes that *Western Natural Gas Co.* and *McVean & Barlow* have been superseded

---

[2]Arguably, the case for taxing a fictional gain from a fictional liquidation may be weaker than the case for taxing an actual gain from an actual liquidation.

by statute, but that does not mean that those courts incorrectly interpreted the statutes as written at the time. Indeed, one of the articles cited by the Department states that "there is a growing consensus among state courts that income from a sale of assets pursuant to a plan of complete liquidation falls outside the 'business income' definition and should be afforded nonbusiness income treatment," before noting that certain courts have taken the same position with respect to "partial liquidations" involving the termination or cessation of business lines, business segments or geographical segments of a larger business. B. Daigh, G. Allen & C. Whitney, *The UDITPA Business Income Definition and the Cessation-of-Business Concept*, State Tax Notes (February 27, 2001).[3]

One treatise cited by the Department is critical of one application of the cessation of business concept under a statute that is worded slightly differently from UDITPA and opines that the use of the sale proceeds should be irrelevant to the functional test. However, the same treatise distinguishes *Laurel Pipe Line* (as opposed to arguing that it was wrongly decided), and opines that the original UDITPA language "does not justify the functional test in the first place." 1 J. Hellerstein & W. Hellerstein, State Taxation, Constitutional Limitations and Corporate Income and Franchise Taxes, par. 9.05(2)(b)(I) (3d ed. 2002 Supp.). A treatise that rejects the functional test is not the strongest authority for any particular application of the functional test.

In sum, a review of the secondary authorities cited by the Department does not clearly suggest that *Blessing/White* was wrongly decided.

The question that the Department seems unable to answer is why the *Texaco-Cities* court distinguished *Laurel Pipe Line*, rather than simply rejecting it as unpersuasive. Our supreme court concluded that:

> "Unlike the cases upon which Texaco-Cities relies, there was no evidence that this sale was a cessation of a separate and distinct portion of Texaco-Cities' business. *Cf. McVean & Barlow, [Inc. v. New Mexico Bureau of Revenue]*, 88 N.M. 521, 543 P.2d 489 [1975]. *Thus*, the gain from the sale was properly classified as business

---

[3]With regard to total versus partial liquidations, it is notable that in *Texaco-Cities*, the taxpayer continued to do business after the asset sale, whereas the business in *Blessing/White* ceased its operation. In this case, American States continued to do business in reality, but is treated as having liquidated and having created a new entity for the purposes of section 338 of the Internal Revenue Code. This aspect of the case will be discussed further below.

income subject to apportionment under the Act." (Emphasis added.) *Texaco-Cities*, 182 Ill. 2d at 274, 695 N.E.2d at 487.

A reading of the plain language of *Texaco-Cities* shows that it concluded the gain was properly classified as business income *because* of a lack of evidence that the sale was a cessation of a separate and distinct portion of Texaco-Cities' business. Moreover, its conclusion cites to *McVean & Barlow*, which held that such gains are nonbusiness income. Accordingly, our supreme court's own language in *Texaco-Cities* appears to support the inference drawn by this court in *Blessing/White*. Furthermore, in this case, the parties agree that there are no disputed facts, only disputes about the application of the law to those facts.

The Department argues in the alternative that it properly classified the gain here as business income, even if *Blessing/White* was properly decided. The Department notes that the *Blessing/White* court stated that *"Texaco-Cities* \*\*\* suggests that the functional test will be met in such cases \*\*\* where the property and the liquidation of assets (*i.e.*, disposition) are essential to the taxpayer's regular trade or operations." (Emphasis omitted.) *Blessing/White*, 329 Ill. App. 3d at 726, 768 N.E.2d at 341-42.[4] The Department's brief states that in this case, "the corporate liquidation did not result in the discontinuation of business activity and both the property disposed of and the deemed liquidation were essential to American States' regular trade or business operations."

However, in its reply brief, the Department:

> "acknowledges that its policy both during the tax year in question [1997] and at present is to fully recognize the section 338(h)(10) fiction. Thus, as stated in its current regulation, a corporation treated as two separate corporations for federal tax purposes under section 338(h)(10) will likewise be treated as two separate corporations under the [Act]."

As the Department treats American States under section 338(h)(10) of the Internal Revenue Code as two corporations—the "old," liquidating American States and the "new" American States (which is deemed an unrelated entity, as the Department admits in its statement of facts)—it cannot claim that American States continued its business.

---

[4]The Department suggested in passing during oral argument that a business could be created with a sole or substantial purpose of acquiring, managing and disposing of an asset. Whether any such case would fall within the scope of *Blessing/White* is beyond the scope of this appeal; this court does not render advisory opinions.

Rather, it must treat the transaction as a liquidation of the "old" American States, which is the entity the Department seeks to tax.[5]

In sum, the trial court correctly applied the applicable case law. Moreover, the applicable case law is in accord with the growing consensus of opinion on the issue. The transaction at issue must be treated legally as a complete liquidation and cessation of business by the "old" American States. Indeed, even as a purely factual matter, the transaction involved the cessation of a separate and distinct portion of the business of the former shareholders of American States. Accordingly, the trial court properly ruled that the gain at issue was nonbusiness income.

For all of the aforementioned reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

O'BRIEN and REID, JJ., concur.

---

[5]Incidentally, the Department also claims in its brief that "Lincoln received a tax-fee distribution of cash" from the asset sale. The Department cites Treasury Regulation section 1.338(h)(10)—1(e)(2)(iv) as support for its claim. See Treas. Reg. § 1.338(h)(10)—1(e)(2)(iv) (1997); see also 26 C.F.R. § 1.338(h)(10)—1(e)(2)(iv) (2002). This regulation merely states that the selling corporation will generally not recognize a gain or loss on the sale of the target corporation's *stock* when the section 338(h)(10) election is made. The Department points to no evidence supporting the assertion that Lincoln paid *no* tax on the gain. To the contrary, the Department's own statement of facts declares that Lincoln reported the gain "as an asset rather than stock gain." A review of sections 337 and 331 of the Internal Revenue Code suggests that a selling corporation would generally report the proceeds of a sale as a capital gain for federal tax purposes when a section 338(h)(10) election has been made. Moreover, the Department's reference to the cash distribution in this case is notable because it underscores that the proceeds of the deemed asset sale here were not reinvested in the business operations of either American States or Lincoln.